**James STASSI, Petitioner,**

v.

**UNITED STATES of America, Respondent.**

Civ. A. No. 76–355.

United States District Court, D. New Jersey.

Sept. 29, 1976.

John P. Russell, Jersey City, N.J., for petitioner.

James M. Deichert, U.S. Dept. of Justice, Newark, N.J., for respondent.

## OPINION

STERN, District Judge.

This is a petition brought pursuant to Title 28 United States Code, § 2255 to vacate a sentence and judgment of conviction entered upon petitioner's plea of guilty to one count of a multiple count indictment. Petitioner and a co-defendant were charged in indictment No. 74–433. Petitioner was named in the first two counts of the indictment, which charged him with conspiring to engage in the business of dealing in firearms without an appropriate license, and with actually having engaged in such an unlicensed business in firearms.

On April 21, 1975, the co-defendant retracted his plea of not guilty and entered a plea of guilty to one count of the indictment. On June 2, 1975, the peremptory trial date, with a jury panel in the courtroom, the defendant Stassi retracted his plea of not guilty to the indictment and entered a plea of guilty to the conspiracy count. A transcript of the entire Rule 11 proceeding is attached as Appendix "A" to this opinion. Certain relevant portions are noted here:

> THE COURT: This crime is punishable by what? Five years' imprisonment and a fine of $10,000 or both?
>
> MR. RUSSELL: [Counsel for the defendant] Yes.
>
> THE COURT: Have you told that to your client?
>
> MR. RUSSELL: Yes.
>
> THE COURT: Do you know of any promise or any inducement which has been made or offered to your client to induce him to plead guilty here this morning?
>
> MR. RUSSELL: The only statement—I won't call it a promise, your Honor— would be the fact that the government has indicated to me that they would move upon sentencing date to dismiss Count II of this indictment.
>
> THE COURT: Is that the only other count that he is named in?
>
> MR. RUSSELL: Yes, sir.
>
> MR. DEICHERT: Yes, sir.
>
> THE COURT: Well, has anybody given either you or your client any indication of what sentence this Court would impose if your client pled guilty to this Count I?
>
> MR. RUSSELL: No mention of sentencing at all, your Honor.
>
> THE COURT: Does that accord with your understanding, Mr. Deichert?
>
> MR. DEICHERT: [the prosecutor] Yes, sir, it is.

THE COURT: Mr. Stassi, have you heard your attorney?

DEFENDANT STASSI: Yes.

THE COURT: He says you want to plead guilty? Is that so?

DEFENDANT STASSI: Yes.

THE COURT: Well, before accepting your plea, Mr. Stassi, I am going to place you under oath and ask you certain questions. I want you to understand that if you do you [sic] not tell me the truth in response to my questions while you are under oath, you will be committing the separate crime of perjury.

DEFENDANT STASSI: Yes.

THE COURT: Swear Mr. Stassi, please.

\* \* \* \* \* \*

Q [the Court] Now, as I have told you or as you have heard, this is a crime punishable by up to five years' imprisonment or $10,000 in fines or both. Did you know that?

A [the defendant] Yes, sir.

Q Now, has anybody given you any indication or promise that if you plead guilty here today I would impose anything less than the maximum sentence upon you?

A There was no promises made of any sort.

Q Anybody give you any indication as to what my sentence might be?

A No. There is no indication of any sentencing.

Q I tell you this, Mr. Stassi: I have never discussed your case with anyone. As I sit here now I don't know what sentence I would give you and will not know until I have seen a presentence report. I tell you, further, that if anyone has given you any indication of what sentence I would give you if you pled guilty here today they are lying to you and deceiving you. Do you understand me?

A Yes, sir.

Q Do you believe me?

A I believe you.

Q I tell you now that if anyone has given you any such promise or indication, tell me now and I will listen to you. But if you wait until after I pronounce sentence and if you are dissatisfied with my sentence and try to tell me of some promise or indication or inducement, I won't listen to you then. Do you understand me?

A Yes, sir.

Q Do you have anything to tell me in this regard?

A No.

(Tr. 6/2/76, at 3–4, 7–8)

On June 23, 1975, after the preparation of a presentence report, this Court sentenced the petitioner to a term of four years' imprisonment and a $10,000 fine. Upon petitioner's subsequent application for reduction or modification of sentence, this Court, on September 29, 1975, ordered that the sentence be served under conditions of early parole eligibility, pursuant to the then Title 18, United States Code, § 4208(a)(2). The Court received two subsequent *pro se* communications from the petitioner, both of which are reproduced in the margin as Appendix "B." In the first letter, dated December 18, 1975, the petitioner discussed his prospects for obtaining release on parole following his first Parole Board hearing. This letter was referred to his attorney for any action deemed appropriate. The second letter, dated January 20, 1976, requested that the Court recommend that petitioner be incarcerated for the remainder of his term in Allenwood Camp. This letter was answered directly by the Court. None of petitioner's three communications with the Court, the first through counsel and the latter two *pro se*, made any reference whatsoever to unfulfilled sentencing expectations.

In February 1976, apparently immediately after receiving this Court's reply to his letter of January 20, 1976, petitioner filed the instant proceeding. In his moving papers he alleged (a) that he was never informed of the possibility that a fine of $10,000 might be imposed; and (b) that ". . . the government did not live up

to it's plea bargain arrangements, which was [sic] a promise of a sentence not to exceed two (2) years". In support of the latter contention, raised for the first time, petitioner submitted an affidavit which is reproduced here in its entirety:

### AFFIDAVIT

JAMES L. STASSI, being duly sworn upon his oath, deposes and says:

1. In November of 1974, I went to the Sixth Floor of the Federal Building in Newark, New Jersey with my attorney, John Russell, Esq. We went there to listen to tapes which the government was going to use at my trial.

2. During the time I was there, Mr. Russell met with Mr. Deichert who was the government attorney in charge of my case and they had a discussion about a plea of guilty by me. After Mr. Russell talked to Mr. Deichert, he told me that if I pleaded guilty I would receive no more than two years in jail. Mr. Deichert then walked towards me and I stated "I want a suspended sentence and no fine." Mr. Deichert stated, "Judge Stern won't go for a suspended sentence but he will agree on the two years."

3. Again on June 2, 1975, the date I was supposed to go on trial, I talked with Mr. Russell and again he told me in the third floor hallway, outside Federal Courtroom No. 1, that if I pleaded guilty, I would get no more than two years. Mr. Deichert also told me that I would get a two-year sentence if I pleaded guilty on June 2, 1975. This was told to me by Mr. Deichert outside Judge Stern's courtroom.

4. At that time, Mr. Russell told me that I should say nothing about the promise that I would receive no more than the two years as my sentence. He told me to say "no promises" when Judge Stern questioned me about promises. I followed Mr. Russell's advice and told Judge Stern that there were no promises when he asked me about promises.

5. I am not guilty of this charge and I was persuaded to say that I was guilty by Mr. Russell's promises that I would get no more than two years and maybe less than two years. I was also persuaded to plead guilty by Mr. Deichert making the same promises to me.

(s) James L. Stassi
JAMES L. STASSI

In response, the attorney for the United States has submitted his own affidavit, in which he avers as follows:

2. The Government's position regarding the matter of a guilty plea was that sentencing was a matter entirely within the province of the Court. At no time during the pendency of the charges against James Stassi did I ever make any agreements, promises, representations or predictions to either Mr. Stassi or his counsel, John P. Russell, concerning the type of sentence which might be imposed by the Court if the defendant Stassi pled guilty to any charges.

(Affidavit of James Deichert, 3/29/76).

Petitioner requests an evidentiary hearing in the instant proceeding.

Title 28 United States Code, § 2255 requires that a hearing be held unless the files and records of the case conclusively establish that a petitioner is entitled to no relief. It is the holding of this Court that the files and records of the instant case establish that the petitioner's second claim is as devoid of merit as his first one. Accordingly the request for an evidentiary hearing is denied, as is the motion to vacate his sentence and conviction.

■ The first allegation made by the petitioner, i. e., that he was not informed that a fine of $10,000 might accompany a conviction, is frivolous. The transcript of the Rule 11 proceeding reveals that petitioner was adequately informed of the potential consequences of a plea of guilty. (See Tr. 6/2/75, at 3, 7) The second allegation made by the petitioner is equally without basis. It is of course true that the voluntariness of a plea of guilty may be impugned by threats or promises made by government officials with respect to sentence. See, e. g., Machibroda v. United

*States,* 368 U.S. 487, 489–490, 82 S.Ct. 510, 7 L.Ed.2d 473 (1962). But the factual assertions contained in petitioner's affidavit and his moving papers may, under the circumstances of this case, be rejected as conclusively foreclosed by the files and records of the case. Petitioner himself explicitly and fully contradicted each and every one of his assertions, under oath, at the time of the Rule 11 proceeding. The record is replete with prior inconsistent statements made by petitioner in the form of earlier applications for reduction and/or modification of sentence, none of which made any reference whatsoever to the claim he now so belatedly seeks to press. His accompanying assertion of innocence is wholly incredible in light of the overwhelming evidence of his guilt brought out at the Rule 11 proceeding from his own mouth and from the files of the United States, which were prepared for trial. (*See* Tr. 6/2/75, at 8–23) This Court has previously held in *Martinez v. United States,* 411 F.Supp. 1352 (D.N.J.), aff'd by judgment order 547 F.2d 1162 (3d Cir. 1976), that under certain circumstances the files and records of a case may be sufficient to rebut a later assertion by a dissatisfied petitioner that a plea was entered into in reliance upon a promise of leniency from the government. This is just such a case. Because the files and records of this case preclude the possibility that petitioner could establish the factual premise upon which any claim for relief would necessarily be predicated; and since any such reliance on the covert words of others, even if proven, would not be reasonable or justified in the teeth of this Court's plain and unambiguous warnings, relief will be denied.

Furthermore, this opinion will be referred to the Office of the United States Attorney for whatever action is deemed appropriate in light of the contradictory positions espoused by petitioner under oath.

## ORDER

In accordance with the opinion of this Court filed this date,

It is on this 29th day of September, 1976, ORDERED that petitioner's request for an evidentiary hearing be, and it hereby is, denied; and it is further

ORDERED that petitioner's motion to vacate sentence be, and it hereby is denied.

## APPENDIX "A"

THE COURT: I'll hear you, Mr. Russell.

MR. RUSSELL: Judge Stern, on behalf of the defendant James Stassi, I would at this time formally apply to your Honor to withdraw our previous plea of not guilty to the first count of Indictment 74–433 and enter a plea of guilty to Count I of that indictment charging the defendant with the crime of conspiracy.

Judge Stern, I've gone over this matter with Mr. Stassi. I've advised him of his rights with respect to these charges contained in this case. I told him if he wanted to he could have this matter tried before this Court and a jury, place the burden of proving these charges upon the government to establish his guilt beyond a reasonable doubt. He indicated to me that he understood that and being informed of that he still wanted to enter a plea of guilty because in fact he told me that he was guilty of these charges; namely, conspiracy.

THE COURT: You understand I'm prepared to afford him a trial this morning? It has been called for trial. I have a panel of prospective jurors waiting. We can readily afford you a trial. In fact, the only reason it is now a quarter to 11:00—I planned to pick a jury at 10:00—was because you indicated that your client wanted to discuss this matter with you.

MR. RUSSELL: That's right.

THE COURT: But we will gladly afford you that trial this morning, Mr. Stassi, if that is your wish instead. I want you to understand that.

MR. RUSSELL: Do you understand that, Mr. Stassi?

THE COURT: This crime is punishable by what? Five years' imprisonment and a fine of $10,000 or both?

MR. RUSSELL: Yes.

THE COURT: Have you told that to your client?

MR. RUSSELL: Yes.

THE COURT: Do you know of any promise or any inducement which has been made or offered to your client to induce him to plead guilty here this morning?

MR. RUSSELL: The only statement—I won't call it a promise, your Honor—would be the fact that the government has indicated to me that they would move upon sentencing date to dismiss Count II of this indictment.

THE COURT: Is that the only other count that he is named in?

MR. RUSSELL: Yes, sir.

MR. DEICHERT: Yes, sir.

THE COURT: Well, has anybody given either you or your client any indication of what sentence this Court would impose if your client pled guilty to this Count I?

MR. RUSSELL: No mention of sentencing at all, your Honor.

THE COURT: Does that accord with your understanding, Mr. Deichert?

MR. DEICHERT: Yes, sir, it is.

THE COURT: Mr. Stassi, have you heard your attorney?

DEFENDANT STASSI: Yes.

THE COURT: He says you want to plead guilty? Is that so?

DEFENDANT STASSI: Yes.

THE COURT: Well, before accepting your plea, Mr. Stassi, I am going to place you under oath and ask you certain questions. I want you to understand that if you do you not tell me the truth in response to my questions while you are under oath, you will be committing the separate crime of perjury.

DEFENDANT STASSI: Yes.

THE COURT: Swear Mr. Stassi, please.

JAMES L. STASSI, the defendant, being first duly sworn, testified as follows:

EXAMINATION BY THE COURT:

Q Mr. Stassi, your lawyer says that you want to plead guilty to Count I of this indictment. Is that so?

A Yes.

Q Have you been over this indictment with your attorney?

A Yes.

Q Have you discussed with him any possible defenses that you might have to the charges contained in this indictment?

A Yes.

Q Sir, are you satisfied with the legal representation that Mr. Russell has given to you in this case?

A Yes. Very much satisfied with Mr. Russell.

Q Are you presently taking any drugs or medication?

A No.

Q Do you understand everything that is being said in this courtroom?

A Yes, your Honor.

Q Now, Mr. Stassi, you understand that you are accused in this indictment of certain crimes but the indictment is only an accusation. As you stand here now before this Court you are presumed to be innocent of these charges. Do you understand that?

A Yes.

Q As a matter of fact, the only way that you can be convicted of these charges is for the government after a trial to convince all twelve jurors by proof beyond a reasonable doubt that you are guilty, did you know that?

A Yes.

Q At such a trial the government would have to call witnesses and introduce evidence. Your attorney, Mr. Russell, could cross-examine any such witnesses and challenge any such evidence. In addition thereto, you would have the right through your attorney to introduce evidence in your own behalf. You, yourself, could take the stand and testify, if you chose to. And, on the other hand, if you chose not to I would tell the jury that they could take no adverse inference to you from your silence. Do you understand that?

A Yes, sir.

Q After such a trial, Mr. Stassi, if even one juror had a reasonable doubt concerning your guilt you could not be convicted. Did you know that?

A Yes.

Q On the other hand, sir, if you plead guilty today all those important rights will be gone. Do you know that?

A Yes, sir.

Q You will no longer be presumed to be innocent. You will no longer—

A Yes, I understand.

Q —be entitled to a trial at which time the government would have to prove your guilt beyond a reasonable doubt. You will be conclusively found to be guilty out of your own mouth, out of your own confession. Do you understand that?

A Yes.

Q Is it still your desire to plead guilty?

A Yes, sir, it is.

Q Mr. Stassi, if I accept your plea of guilty, because you will thereby be convicted from your own mouth, do you understand that there will be nothing left to be done in your case except for this Court to pronounce sentence upon you? Do you know that?

A Yes, I understand.

Q Now, as I have told you or as you have heard, this is a crime punishable by up to five years' imprisonment or $10,000 in fines or both. Did you know that?

A Yes, sir.

Q Now, has anybody given you any indication or promise that if you plead guilty here today I would impose anything less than the maximum sentence upon you?

A There was no promises made of any sort.

Q Anybody give you any indication as to what my sentence might be?

A No. There is no indication of any sentencing.

Q I tell you this, Mr. Stassi: I have never discussed your case with anyone. As I sit here now I don't know what sentence I would give you and will not know until I have seen a presentence report. I tell you, further, that if anyone has given you any indication of what sentence I would give you if you pled guilty here today they are lying to you and deceiving you. Do you understand me?

A Yes, sir.

Q Do you believe me?

A I believe you.

Q I tell you now that if anyone has given you any such promise or indication, tell me now and I will listen to you. But if you wait until after I pronounce sentence and if then you are dissatisfied with my sentence and try to tell me of some promise or indication or inducement, I won't listen to you then. Do you understand me?

A Yes, sir.

Q Do you have anything to tell me in this regard?

A No.

Q Now, Count I of this indictment charges that from on or about April 30, 1974, and continuously thereafter up to and including October 3, 1974, at Elizabeth and elsewhere in the District of New Jersey, you and Sherwin H. Raymond wilfully and knowingly did combine, conspire, confederate and agree together and with other persons who are unknown to the Grand Jury to commit an offense against the United States; that is, to violate Title 18, United States Code, Section 922(a)(1).

The indictment further alleges in this count that it was part of the conspiracy that you and Raymond would knowingly engage in the business of dealing in firearms without having been issued a license to do so under the appropriate provisions of law, and that it was further a part of the conspiracy that Raymond would offer to sell firearms to one Nicholas Zarrillo and it was further a part of the conspiracy that Raymond would sell firearms and ammunition to Zarrillo and it was further a part of the conspiracy that Raymond and you would offer to sell firearms, destructive de-

vices and ammunition to Nicholas Zarrillo, and that it was further a part of the conspiracy that Raymond and you would negotiate with Zarrillo for the order, sale, transportation and delivery of firearms, destructive devices and ammunition.

Now, that outlines the charges of the conspiracy. Did you know that?

A Yes, sir.

Q Now, in essence and in simple English the first part of the charge is a conspiracy which is nothing other than an allegation that you and Raymond and others came to an understanding or a meeting of the minds that you would do an illegal act. In this case the illegal act being selling firearms without an appropriate license. Do you understand that?

A Yes.

Q That is the essence of the conspiracy charge.

A Yes.

Q Did you do that?

A Would you repeat that once more?

Q Did you do it?

A Yes.

Q What did you do?

A I met Zarrillo for Raymond and he had given me a list.

Q Who had given you a list?

A Zarrillo.

Q Yes?

A "What can you do about this?" I said, "I don't know anything about it."

Q What do you know about what?

A Getting the items on the list.

Q What were the items on the list?

A I didn't—I don't know the items exactly, offhand. I told him, "I don't know anything about these" and I handed him—

Q What was the nature of the things on the list?

A Now I see it now.

MR. DEICHERT: Judge, this is a photocopy of the original list that Mr. Stassi has in his hand.

Q Is that a photocopy of the list Mr. Zarrillo gave you?

A Yes.

Q Does it refresh your recollection as to what it was?

A He had certain items. I don't know just exactly how many.

Q Yes. What was the nature of the items?

A Firearms.

Q Did Zarrillo ask you to procure firearms for him?

A Told me what could I do. He didn't ask me what could I do so far as this list. I told him "I don't know anything about the list" and I handed him back his list. Then he said, "I'll keep in touch."

I said, "Do that." Whatever he was explaining with the doctor, that is between both of them.

Q In other words, you are not guilty?

A No. Being I spoke to him—

Q Why did you speak to him?

A For the doctor told me, "See what he wants." That automatically puts me in the conspiracy.

Q Did Raymond ask you to speak to him?

A At the time, yes.

Q Did Raymond tell you why he wanted you to speak to him?

A Raymond said, "See what he wants." That put me automatically—

Q Did you know that Raymond was in the business of selling guns?

A I always thought he was an antique collector but I never knew before he sent Zarrillo to me that he was already selling to the man, which I never knew. He came to me either April or May. From what I gather, Raymond made several sales to him previous to that. That I never knew. That I'll swear on the Bible.

Q Did you know—did there come a time when you did know that Raymond was selling guns?

A   Yes. After this transaction.

Q   Did you assist him in selling guns?

A   Never did. Never handled any merchandise.

Q   Did you ever agree to help him sell guns?

A   Not exactly. No. The only transaction when Zarrillo came to me as far as keeping these meets and the last meet was around—a few days before Labor Day he came to the gas station. He told me, "I saw the doctor last night and I've got to meet with the doctor and you for this coming Sunday."

I said, "You'd better call me. I don't know nothing about this meet."

This was on the Thursday. I think it was on the Friday. I called the doctor's house. His wife answered. Told me the doctor is on hospital call for the whole weekend. Sunday night Zarrillo called me. He said, "How's that meet?"

I said, "You've got no meet with the doctor. The doctor is on hospital call." And, in turn, he tells me he went to rent a stationwagon. I said, "I gave up the weekend. So far as me is concerned, why does it make a difference?"

Q   Why did you think to rent the stationwagon?

A   I don't know if he had transportation.

Q   Was this after he gave you the list?

A   Yes. Way after.

Q   After he gave you the list did you give it to Dr. Raymond?

A   No. I handed it back to Zarrillo.

Q   You never read it?

A   No.

Q   Did you read the—

A   I gave it a glance and gave it back to him.

Q   Did you tell Raymond what Zarrillo wanted?

A   Raymond, if I remember correctly, I told him "Why did you send this fellow to me?"

He said, "Well, I don't know what he wants. I don't know if I'll be able to get him the stuff."

I said, "Don't put me in the middle, here." Those were my exact words that I talked to the doctor.

MR. DEICHERT: Judge, perhaps I can refresh Mr. Stassi's recollection on one of the conversations on the 20th of June. Mr. Zarrillo and Mr. Stassi met and Mr. Stassi gave him back the list of weapons and they went over it item by item. If I could hand the list up to you so you can follow along with it. They didn't discuss item by item.

THE COURT: Who did?

MR. DEICHERT: Stassi and Zarrillo on a recorded conversation. They discussed the prices of the various weapons. The first item is a submachine gun on the list.

THE COURT: Hand Mr. Stassi a copy of that.

MR. DEICHERT: That is the original; this is a copy.

THE COURT: Hand one to him. Go ahead.

MR. DEICHERT: The first item is M–3 grease guns with silencers.

Zarrillo said, "What's this five and a half?"

Stassi said, "$550."

MR. STASSI: I never did mention, to my recollection, so far as prices.

MR. DEICHERT: Zarrillo said, "Oh, that is the price, huh."

Stassi says, "This is"—unintelligible.

"Zarrillo: You get—

"Stassi: These are automatics. (Unintelligible)

"Zarrillo: Yeah, yeah, yeah, I know."

That is Stassi.

Then go down a little bit further.

"Two hundred apiece.

"Zarrillo: The Walthers, you got twelve of them?

"Stassi: Yeah." They go on further.

"And silencers.

"Zarrillo: All silencers."

They go on further about a time and place they can call up.

Further in the conversation Zarrillo says, "Hand granades. You said something else."

MR. STASSI: Your Honor, yes. The doctor—

THE COURT: Just be quiet.

MR. DEICHERT: A little further—

THE COURT: Just a moment, please, Mr. Deichert. You are interrupting the man. He wants to tell you something.

MR. DEICHERT: I thought he had finished.

MR. STASSI: I'm pleading guilty to all this.

BY THE COURT:

Q Wait a minute. I'm not accepting your plea so fast, Mr. Stassi. I'm not in the business of accepting pleas of guilty from men who do not consider themselves to be guilty. If you don't consider yourself to be guilty, go to trial. Do you understand me?

A Yes.

Q I don't want your plea of guilty. You are doing me no favor and you no favor. Do you understand that? Fair enough?

A Yes, sir.

Q Do you understand me?

A Yes.

Q Now, if you are taking the position that you didn't come to any agreement with anybody to sell guns—if that's what you are telling me, then you're not guilty of this in your own mind and I'm not going to accept your plea. Do you understand me?

A I am guilty, your Honor.

Q What? I can't hear you.

A I did conspire.

Q What did you do? Then tell me outright what you did. If you didn't do anything, we're going to trial.

MR. RUSSELL: Judge, may I be of assistance to the Court?

THE COURT: No. I want this directly from Mr. Stassi, if it is going to come. If it isn't going to come, let's go to trial.

Q What did you do, Mr. Stassi?

A He gave me the list.

Q Who gave you the list?

A Zarrillo.

Q What did you do with the list?

A I in turn gave it back to him.

Q You in turn did what with it? Did you ever furnish him prices for those guns?

A I can't remember.

Q You've just heard Mr. Deichert read to you from—

A Yes.

Q —from a recording.

A So.

Q Have you had an opportunity to go over those transcripts?

A Yes.

Q Is that a recording of your conversation with Zarrillo?

A Yes.

Q Where did you get those prices from, Mr. Stassi?

A From Dr. Raymond.

Q Did you or didn't you get them from Raymond?

A I did.

Q For what purpose?

A To make the sale for the doctor.

Q Sale of what? Of those guns?

A Right.

Q On this list included is ten M-3 grease guns with silencers at five and a half. What does the "five and a half" mean?

A $550.

Q Whose handwriting is that five and a half?

A Not mine.

Q Who put it down there?

A The doctor.

Q Raymond?

A  Yes.

Q  Then you've got five M–16 rifles at 4. What does the "4" stand for?

A  $400.

Q  Who put that figure down there?

A  The doctor.

Q  Did you have this list in your hand when you were talking to Zarrillo, quoting him prices?

A  Yes.

Q  Then you have fifty 45s, U. S. models, with the figure "2". What does that figure "2" stand for?

A  $200.

Q  $200 apiece?

A  Yes.

Q  Where did you get that figure from?

A  From the doctor.

Q  And you've got twenty-five 38s, U. S. models. What does the "38" stand for?

A  $200.

Q  $200 apiece?  .

A  Yes.

Q  Is that a 38 pistol?

A  Yes.

Q  Did you understand that Raymond had twenty-five of those for sale or Zarrillo wanted twenty-five of those?

A  Yes.

Q  I go on. You've got fifty hand granades, frig type or is that frag type?

A  Frig type.

Q  What does that stand for?

A  There is no prices on it.

Q  Why not?

A  Because I don't think he had them on hand.

Q  Raymond didn't have them on hand when you checked?

A  Right.

Q  You've got two bullet-proof vests; right?

A  Right.

Q  What is the price of those?

A  $100.

Q  Where did you get that price from?

A  From the doctor.

Q  Did you offer it to Zarrillo for that price?

A  Yes.

Q  After speaking to Raymond?

A  Yes. Right.

THE COURT: I'm satisfied there is a sufficient factual basis for the acceptance of this plea.

Q  You understand what you are pleading guilty to is not merely having agreed with Raymond to unlawfully dispense guns and other prohibited devices but that you actually put the agreement into effect by doing an overt act. I gather you actually did put it into effect because you did meet with Zarrillo and did offer to sell him those specific items we've just gone over. Is that so?

A  That's so.

THE COURT: I'm satisfied there is a sufficient factual basis for the acceptance of this plea pursuant to Rule 11 of the Federal Rules of Criminal Procedure.

Q  Mr. Stassi, I want to ask you this final question: Has anybody told you what questions I would ask you here and instructed you to lie to me?

A  No.

Q  I want to emphasize again before I accept this plea, Mr. Stassi, if in your own mind there is any doubt of your own guilt do not plead guilty. Do you understand me?

A  Yes.

Q  Do you wish to plead guilty here?

A  I wish to plead guilty because I'm guilty of the crime.

THE COURT: All right. I'll accept your plea based on your words.

Q  Do you understand me?

A  Yes, sir.

Q  This courtroom has been all set up for this trial. There is sound equipment here.

I've got a panel of jurors waiting, brought in for your case. I gather the government has assembled a great deal of evidence, the guns, the recordings.

THE COURT: Is that right?

MR. DEICHERT: Yes, sir.

Q I tell you, Mr. Stassi, I've given you every opportunity now not to plead guilty. Do you understand me?

A Yes, sir.

Q Once you plead guilty all of this case will be disassembled. Do you understand that?

A Yes, sir.

Q You still want to plead guilty?

A Still want to plead guilty.

THE COURT: All right. Any other inquiry anybody wants to make?

MR. RUSSELL: None, your Honor.

THE COURT: Your plea of guilty will be accepted to Count I of the indictment.

MR. DEICHERT: Judge, the bail situation is $50,000 surety. We'd request that it be continued.

THE COURT: Yes. Bail will be continued.

What is the date for Raymond's sentencing?

MR. DEICHERT: June the 23rd, sir.

THE COURT: I don't know whether the Probation Department can get this job done at the same time.

MR. RUSSELL: I'll send him up there directly, Judge.

MR. DEICHERT: If I can be of assistance, they haven't contacted me as of yet on the facts of the case for Dr. Raymond.

THE COURT: Maybe they can. This will be set down for June 23rd for sentencing.

Convenient to you, Mr. Russell?

MR. RUSSELL: Yes, sir.

THE COURT: Will you immediately conduct your client up to the Probation office?

Mr. Deichert, you go with them.

MR. DEICHERT: Yes, sir.

THE COURT: Mr. Russell, following there you are to proceed immediately to Judge Camarata.

MR. RUSSELL: I was going to make a statement but I don't want to.

THE COURT: Make a statement about what?

MR. RUSSELL: It is unnecessary. I wanted to clear up, perhaps, some of the ambiguity that Mr. Stassi said—

THE COURT: I don't find anything ambiguous once I finally vocalized the questioning.

MR. RUSSELL: Yes.

THE COURT: Do you think there is anything ambiguous?

MR. RUSSELL: No.

THE COURT: He made a confession of guilt that satisfies me.

MR. RUSSELL: Very well.

THE COURT: Proceed.

APPENDIX "B"

RECD

DEC 22 '75 DEC. 18, 1975
JAMES STASSI
81879-158
LEWISBURG, PA.

HON. JUDGE STERN:
    THE PAROLE BOARD HERE AT LEWISBUR,
DID NOT TAKE INTO CONSIDERATION THE A-2

SENTENCE YOUR HONOR IMPOSED ON ME AT TIME OF SENTENCE. WHEN I WENT FOR MY HEARING (SEPT-29-1975). THEY DIDN'T ABIDE BY THE A-2 AND TREATED ME INSTEAD AS A REGULAR ADULT SENTENCE. THE INSTITUTION RECOMMENDED NO MORE THAN 16 MONTHS, THEY HAVE PUT IT IN THE 20-26 MONTHS' RANGE.

I BELIEVE WHEN YOUR HONOR, GAVE ME AN A-2 SENTENCE, YOU TOOK FOR GRANTED THE PAROLE BOARD, WOULD OF RELEASED ME AT 1/3 OF MY SENTENCE, PROVIDING I HAD A GOOD INSTITUTIONAL PROGRAM + ADJUSTMENT. MY INSTITUTIONAL REPORT WAS BETTER THAN GOOD.

PLEASE TAKE THIS LETTER INTO CONSIDERATION AND LOOK INTO THIS MATTER FOR ME. I WOULD APPRECIATE ANY CONSIDERATION YOU HAVE ON THIS IMPORTANT ISSUE IN MY LIFE.

YOURS RESPECTFULLY,

James Stassi

---

January 20, 1976

Honorable H. W. Stern
U. S. District Court
District of New Jersey
311—U. S. Court House
Newark, New.Jersey 07101

Dear Sir:

I am writing to you, your Honor, because of a situation I am presently having here at Lewisburg Penitentiary, involving my presentence report which contains numerous false alligations. It is because of these alligations that I have been denied access to the Allenwood Federal Prison Camp, located at Montgomery, Pa., 17752.

I am hoping that your Honor could, if possible, make a recommendation for my transfer to Allenwood.

I would greatly appreciate any assistance you may afford me. Thanking you in advance I remain:

Sincerely;
James Stassi
P. O. Box 1000
Lewisburg, Pa., 17837

P.S. I have been approved in a written statement by the Warden at Allenwood. (Mr. Shea)

January 23, 1976

Mr. James Stassi
P. O. Box 1000
Lewisburg, Pennsylvania 17837

Re: United States v. James Stassi
Criminal No. 74–433

Dear Mr. Stassi:

I have your letter of January 20, 1976. While I am not unsympathetic to your request, I have always taken the position that it is beyond the jurisdiction of a federal judge, after he has pronounced sentence, to attempt to tell the Department of Prisons where any particular prisoner should be placed.

Very truly yours,

HERBERT J. STERN
United States District Judge